IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MAY 1 7 2012

UNITED STATES OF AMERICA    )
    )    CRIMINAL NO: 1:12MJ337
v.    )
    )
JESUS DELGADO    )
    )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, James McHugh, being duly sworn, depose and state as follows:

1.    Your Affiant has been employed as a Special Agent of the Drug Enforcement Administration since 2001. During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity. As a narcotics investigator, your affiant has interviewed many individuals involved in drug trafficking and has obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and users of controlled dangerous substances. I am currently assigned to DEA's High Intensity Drug Trafficking Area Task Force.

2.    I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510 (7), that is, I am an officer of the United States, who is authorized by law to conduct investigations of and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.     This affidavit is being submitted in support of a criminal complaint and arrest warrants charging JESUS DELGADO with conspiracy to distribute 100 or more kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4.     This affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter observed by or known to the United States. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating witnesses. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observation. All subjects named in this affidavit have been fully identified by either law enforcement officers or cooperating witnesses.

5.     Law enforcement officers utilized cooperating witnesses throughout this investigation. For the purpose of this affidavit, all cooperating witnesses will be referred to in the masculine gender. Each cooperating witness has provided information against his own penal interest; said information has been independently corroborated by law enforcement, and is considered reliable. CW-1 has been convicted of money laundering in the Eastern District of Virginia and is cooperating with law enforcement in hopes of receiving a reduction in sentence. CW-2 has been convicted of conspiracy to distribute 100 kilograms or more of marijuana and money laundering in the Eastern District of Virginia and is cooperating with law enforcement in hopes of receiving a reduction in sentence. CW-3 has been convicted of money laundering in the Eastern District of Virginia and is cooperating with law enforcement in hopes of receiving a reduction in sentence.  CW-4 is cooperating with law enforcement in hopes of receiving a

2

reduction in sentence for charges of conspiracy to distribute cocaine and money laundering that he may face in the Eastern District of Virginia.

### Probable Cause

6.     In or about 2009, law enforcement officers obtained information that JESUS DELGADO (hereafter DELGADO), along with others, were obtaining multiple pound quantities of marijuana and cocaine hydrochloride from sources of supply based in Florida for further distribution in the Eastern District of Virginia and elsewhere.

7.     Through further investigation and information provided by confidential witnesses, it was learned that DELGADO and others were utilizing rental vehicles to transport money from northern Virginia to Florida and returning with large quantities of marijuana.  DELGADO and other co-conspirators were also found to also be utilizing Federal Express (FedEx), United Parcel Service (UPS), and the United States Postal Service (USPS) to send money to suppliers based in the Santa Barbara area of California.  In exchange, they received packages containing multiple pounds of marijuana that was sent to various locations in the Eastern District of Virginia and elsewhere.

8.     On or about September 16, 2009, in Ridgeland, South Carolina, law enforcement officers conducted a traffic stop of a rental vehicle traveling southbound on Interstate 95.  Two individuals, who later became cooperating witnesses (hereafter CW-1 and CW-2), were traveling in the vehicle.  CW-1 and CW-2 provided conflicting details of their reasons of travel and exhibited signs of nervousness.  A law enforcement drug detection canine alerted on the vehicle for the presence of controlled substance(s) and a search of the vehicle was conducted.  During the search of the rental vehicle, law enforcement officers seized $101,725 from the trunk of the

vehicle, along with several cellular telephones. During the traffic stop, CW-2 provided law enforcement with his home address, located in Arlington, Virginia (hereafter Address 1).

9.     On or about January 25, 2010, in Yemasse, South Carolina, law enforcement officers conducted a traffic stop of a rental vehicle occupied by two subjects (hereafter UCC-1 and UCC-2), which was traveling southbound on Interstate 95. Both subjects provided conflicting details of their reasons of travel and exhibited signs of nervousness. A law enforcement drug detection canine alerted on the vehicle for the presence of controlled substance(s) and a search of the vehicle was conducted. During the search of the rental vehicle, law enforcement officers seized $48,000 from the trunk of the vehicle, along with several cellular telephones. Information found in the rental vehicle revealed that the vehicle had been rented by UCC-3, DELGADO's girlfriend at that time.

10.     On or about April 7, 2010, law enforcement officers intercepted a suspicious FedEx package addressed to a location in Lompoc, California (hereafter Address 2) from an address in Springfield, Virginia (hereafter Address 3). On April 8, 2010, following a positive indication by a law enforcement K-9 trained in the detection of illegal narcotics, a search warrant was obtained and executed on the package resulting in the seizure of $13,000 in United States currency.

11.     On or about May 24, 2010, law enforcement officers intercepted a USPS package addressed to a fictitious name at Address 1 from R&D Designs at an address in Santa Barbara, California (hereafter Address 4). On May 24, 2010, following a positive indication by a law enforcement K-9 trained in the detection of illegal narcotics, a search warrant was obtained and executed on the package resulting in the seizure of approximately five (5) pounds of suspected marijuana. A test was conducted at the Drug Enforcement Administration (DEA) Mid-Atlantic

Laboratory, which confirmed the substance to be marijuana weighing approximately 2,248 grams.

12.    On or about June 3, 2010, law enforcement officers executed search warrants at three residences belonging to an individual who later became a cooperating witness (hereafter CW-3).    The three residences including Address 2 (referenced in paragraph 10), a second location in Lompoc, California, and a residence in Solvang, California (hereafter Address 5). During the searches, law enforcement officers found a large quantity of equipment utilized to cultivate marijuana including: "grow lights," irrigation systems, and other paraphernalia, along with a total of approximately $23,039 in United States currency.    Also found were mailing labels from the USPS and FedEx.  A total of approximately 98 suspected marijuana plants were seized along with approximately 12 pounds of suspected processed marijuana, almost all of which were located at Address 2.  A preliminary field test was conducted receiving a positive result for marijuana on the contraband seized at the residence.  When entry was made at Address 2, CW-1 and CW-3 were present inside the residence and placed under arrest.

13.    Law enforcement officers conducted a review of the mailing labels seized from CW-3's residences.  Law enforcement found seven California addresses listed on the seized mailing labels, including Address 4 and Address 5.  Law enforcement found five northern Virginia addresses on the seized mailing labels, including four labels listing Address 1 and one listing an additional address in Springfield, Virginia (hereafter Address 6).

14.    CW-1 provided law enforcement with information regarding his involvement in a conspiracy to distribute marijuana.  CW-1 stated that he met CW-2 in and around the beginning of 2009, through an associate of DELGADO. DELGADO then recruited CW-1 and CW-2 to transport money to Florida, to purchase multiple pounds of marijuana, and to transport the

marijuana back to the Eastern District of Virginia for further distribution. CW-1 stated that he and CW-2 made several trips to Florida at the request of DELGADO, returning with at least four (4) pounds of marijuana per trip. CW-1 stated that on several occasions, DELGADO directed CW-1 to "wire" money to DELGADO in Florida while DELGADO was obtaining drugs. On at least one of the trips to Florida, at the direction of DELGADO, CW-1 met with a "relative" of DELGADO to obtain marijuana. CW-1 stated that the money seized by law enforcement on September 16, 2009 (as outlined in paragraph 8) was comprised of money put together by himself, CW-2, and DELGADO to purchase approximately fifteen (15) to twenty (20) pounds of marijuana in Florida for further distribution in the Eastern District for Virginia.

15.     CW-1 further reported that during the summer of 2009, CW-1 became aware that CW-3 was cultivating marijuana in Lompoc, California, and he began to also obtain packages containing marijuana from CW-3 for himself, CW-2, and DELGADO. Following the money seizure on September 16, 2009, CW-1 and CW-2 began to regularly obtain packages with marijuana from CW-3, through mailing services. CW-1 reported that DELGADO would purchase marijuana from CW-1 and CW-2 for further distribution. CW-1 also stated that DELGADO contributed money to send to California to obtain marijuana, and provided CW-1 and CW-2 with addresses in the Eastern District of Virginia to which the packages would be shipped.

16.     CW-1 further stated that he lived at Address 3 in Springfield, Virginia – the same address as on Federal Express package seized on April 7, 2010. CW-1 admitted that he and CW-2 had sent the package containing $13,000 in United States currency (as outlined in paragraph 10), which was payment for marijuana that CW-3 had shipped to the Eastern District of Virginia. CW-1 stated that on previous occasions, he had sent money to CW-3 and he, CW-2 and

DELGADO received multiple pounds of marijuana at various addresses in the Eastern District of Virginia.

17.     CW-2 provided law enforcement with information regarding his involvement in a conspiracy to distribute marijuana.  In or about mid-2009, CW-2 was introduced to DELGADO by an associate of DELGADO.  At that time, DELGADO stated that he was obtaining multiple pounds of marijuana and kilogram quantities of cocaine from suppliers in Florida.  DELGADO told CW-2 that he had people making trips with money to Florida with money and then returning to the Washington, D.C. metropolitan area with marijuana for further distribution.  According to CW-2, DELGADO recruited him and CW-1 to work as couriers.  CW-2 stated that he made several trips for DELGADO, usually transporting between $12,000 and $20,000 to pick up marijuana.  CW-2 estimated that between that initial meeting and September 2010, he made between seven (7) to ten (10) trips for DELGADO, always picking up multiple pounds of marijuana.  DELGADO also asked CW-2 to transport cocaine, but CW-2 refused.  CW-2 stated that, prior to the money seizure outline in paragraph 8, the largest amount of money taken to Florida was between $50,000 to $55,000, which was used to purchase between thirteen (13) and fifteen (15) pounds of marijuana.

18.     CW-2 stated that the money that was seized during the September 16, 2009 traffic stop was comprised of money contributed by himself, CW-1, and DELGADO.  After pooling the money, DELGADO made the arrangements with the suppliers in Florida.  After the money seizure, CW-2 stated that CW-1 and DELGADO again pooled money to purchase marijuana.  DELGADO arranged for a supplier to travel from Florida to the Washington, D.C. metropolitan area with the marijuana.  CW-2 stated that UCC-1 made several trips to meet DELGADO with up to approximately thirty (30) pounds of marijuana at a time.  CW-2 also identified UCC-1, one

of the individuals in the vehicle stopped with $48,000 (as outlined in paragraph 9) as a supplier/transporter affiliated working with DELGADO. Following the September 16, 2009 seizure, CW-2 had limited dealings with DELGADO but stated that DELGADO was aware of the packages being mailed from California that contained marijuana and may have continued dealing with CW-1.

19.     CW-3 provided law enforcement with information regarding his involvement in a conspiracy to distribute marijuana. CW-3 informed law enforcement that he had mailed multiple packages, usually containing between four (4) and five (5) pounds of marijuana, to CW-1 in the Eastern District of Virginia and elsewhere.  CW-3 stated that CW-1 told him that he was obtaining the marijuana for himself, CW-2, and Jesus LNU.

20.     CW-4 provided law enforcement with information regarding his involvement in a conspiracy to distribute marijuana. CW-4 identified DELGADO as a distributor of marijuana and cocaine in the Eastern District of Virginia and elsewhere.  CW-4 stated that he met DELGADO through UCC-3. In and around the fall of 2008, CW-4 learned that DELGADO was distributing marijuana and cocaine, and CW-4 stated that DELGALDO told him that he had marijuana and cocaine suppliers in Florida. From in and around the fall of 2008 through in and around the fall of 2009, CW-4 observed DELGADO with quantities between approximately two hundred and fifty (250) and five hundred (500) grams of suspected cocaine on a least one occasion. CW-4 also stated that he purchased one ounce of cocaine from DELGADO on at least three occasions.  CW-4 further stated that DELGADO asked CW-4 to recruit cocaine and marijuana customers and paid CW-4 a fee for each customer.

21.     CW-4 stated that in and around the end of 2009, CW-4 was present when CW-1 and CW-2 spoke to DELGADO about the money seizure (outlined in paragraph 8).  According

8

to CW-4, DELGADO and the others spoke about the money and stated that it was being taken to Florida to purchase marijuana. CW-4 also heard DELGADO talked about another money seizure by law enforcement and indicated that the money was also being taken to purchase marijuana in Florida. CW-4 also identified UCC-1 as being a person who would deliver multiple pounds of marijuana to DELGADO. In addition, CW-4 stated that on one occasion, he had observed approximately forty (40) pounds of marijuana at DELGADO's residence that DELGADO stated was brought to him by UCC-1.

22.    Law enforcement officers obtained business records from Western Union for cash transactions involving DELGADO. The following transactions were found:

| Date | Sender | Payee/Location | Amount |
|------|--------|----------------|--------|
| 06/12/09 | CW-1 | DELGADO, Hollywood, FL | $450 |
| 06/13/09 | CW-1 | DELGADO, Hollywood, FL | $450 |
| 06/13/09 | D.R.[1] | DELGADO, Hialeah, FL | $500 |
| 06/21/09 | D.J. | DELGADO, Miami, FL | $950 |
| 06/23/09 | CW-1 | DELGADO, Miramar, FL | $900 |
| 06/26/09 | CW-1 | DELGADO, Miramar, FL | $2,000 |

23.    Law enforcement also obtained business records from FedEx, UPS, and USPS for information regarding packages shipped from or to the addresses affiliated with the mailing labels seized from CW-3's residence (outlined in paragraphs 12 and 13), as well as the packages seized from law enforcement (outlined in paragraphs 10 and 11). In reviewing the records obtained, it was found that between October 15, 2009 and June 4, 2010, approximately forty-three (43) packages were mailed from northern Virginia to either Address 2 or Address 5. It was also found that between October 15, 2009 and June 4, 2010, approximately forty-one (41)

[1] Full name of senders abbreviated

packages were mailed from California to the northern Virginia addresses. Most, if not all of the mailing labels had characteristics consistent with the shipping of narcotics including next day delivery dates, waiver of signatures, false names and addresses, and cash payment for express services.

24.     On or about January 16, 2011, in Yemasse, South Carolina, law enforcement officers conducted a traffic stop of a vehicle traveling northbound on Interstate 95, which was occupied by DELGADO and two other individuals.   The vehicle was registered to a family member of DELGADO at an address in Woodbridge, Virginia (hereafter Address 7).   As the vehicle was coming to a stop, law enforcement observed objects being thrown out of a window of the vehicle.   The occupants, including DELGADO, provided conflicting details of their reasons of travel and exhibited signs of nervousness. A law enforcement drug detection canine alerted on the vehicle for the presence of controlled substance(s) and a search of the vehicle was conducted. During the search of the vehicle, law enforcement officers seized approximately six (6) pounds of suspected marijuana. A preliminary field test was conducted receiving a positive result for marijuana. In addition, DELGADO provided Address 7 as his home address to law enforcement

25.     On or about March 30, 2011, law enforcement officers intercepted a USPS package addressed to a fictitious name at Address 7 with a return address in San Bernardino, California. On March 31, 2011, following a positive indication by a law enforcement K-9 trained in the detection of illegal narcotics, a search warrant was obtained and executed on the package resulting in the seizure of approximately one-half (1/2) pound of suspected marijuana. A preliminary field test was conducted receiving a positive result for marijuana.

26.    On or about April 24, 2011, law enforcement officers responded to a hotel in located in Arlington County, Virginia to assist hotel personnel in banning DELGADO from the premises. During the course of this interaction, law enforcement located and seized a quantity of suspected marijuana from DELGADO. A test was conducted at the Drug Enforcement Administration (DEA) Mid-Atlantic Laboratory, which confirmed the substance to be marijuana weighing approximately 176 grams. DELGADO was advised of his Miranda rights, and he agreed to speak to law enforcement. DELGADO stated that he was aware that CW-2 was receiving packages from California that contained multiple pounds of marijuana that were shipped to addresses in the Eastern District of Virginia.

## CONCLUSION

32.    Based on the information provided in this affidavit, probable cause exists to believe that JESUS DELGADO did unlawfully, knowingly, and intentionally conspire to distribute 100 kilograms or more of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

James T. McHugh, Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me
this ___ day of May 2012.

_____/s/_____
John F. Anderson
United States Magistrate Judge
United States Magistrate Judge

11